1

2

3

4                              UNITED STATES DISTRICT COURT

5                                    DISTRICT OF NEVADA

6                                          * * *

MARIJUANA POLICY PROJECT,          )
7    COMMITTEE TO REGULATE AND          )
CONTROL MARIJUANA, AMERICAN        )
8    CIVIL LIBERTIES UNION OF           )
NEVADA, DAVID MCDONOUGH,           )        2:08-CV-00199-PMP-RJJ
9    OREN ROSEN, KERMIT WATERS, and     )
JOSEPH ZITELLO,                    )
10                                      )        O R D E R
Plaintiffs,               )
11                                      )
v.                                 )
12                                      )
ROSS MILLER, Secretary of State of the  )
13   State of Nevada,                   )
)
14              Defendant,              )
)
15   and                                )
)
16   NEVADA RESORT ASSOCIATION, a       )
Nevada nonprofit corporation,      )
17                                      )
Intervenor.               )
18   _____)

19          Presently before the Court is Plaintiffs' Motion for Summary Judgment (Doc.

20   #16), filed on May 21, 2008.  Defendant Ross Miller ("Miller"), Nevada Secretary of State,

21   filed an Opposition and Countermotion for Summary Judgment (Doc. #24).  Defendant-

22   Intervenor Nevada Resort Association ("Nevada Resort") also filed an Opposition and

23   Countermotion for Summary Judgment (Doc. #30).

24          Also before this Court is We the People Nevada's Motion to Intervene (Doc.

25   #18), filed on June 4, 2008.  Defendant Miller filed an Opposition (Doc. #40).  We the

26   People Nevada did not file a reply.  The Court held a hearing on these matters on September

17, 2008.

**I. BACKGROUND**

The Nevada Constitution permits Nevada citizens to amend the Nevada Constitution or Nevada Revised Statutes through the initiative process. Nev. Const. art. XIX, § 2. Before an initiative may be placed on the ballot, it must be signed by "10 percent or more of the voters who voted in the entire State at the last preceding general election." Id. § 2(2). This section also states that a petition must be signed by a "number of registered voters equal to 10 percent or more of the number of voters who voted at the last preceding general election in not less than 75 percent of the counties in the State." Id. This provision, known as the "13 Counties Rule," required that an initiative supporter obtain the requisite signatures from 13 of the 17 Nevada counties. ACLU of Nev. v. Lomax, 471 F.3d 1010, 1013 (9th Cir. 2006). However, in 2004, this Court enjoined the Nevada Secretary of State from enforcing the 13 Counties Rule. (Pls.' Mot. Summ. J. ["Pls.' Mot."], Ex. B (Order and Injunction, CV-S-04-1035-JCM-LRL).) In 2006, the United States Court of Appeals for the Ninth Circuit affirmed, holding the 13 Counties Rule was unconstitutional under the Equal Protection Clause of the United States Constitution. Lomax, 471 F.3d at 1021.

In response to this holding, in 2007, the Nevada Legislature adopted Nevada Revised Statute § 295.012. (See Intervenor's Opp'n Pls.' Mot. Summ. J. & Counter Mot. Summ. J. ["Intervenor's Mot."], Ex. C.) Under this statute, or the "County Population Rule," the total number of signatures required for an initiative to be placed on the ballot is equal to the "number of registered voters from each county in the State that is at least equal to 10 percent of the voters who voted in the entire State at the last preceding general election multiplied by the population percentage for that county." Nev. Rev. Stat § 295.012(1). The first step under the County Population Rule is to determine each county's proportion of the total Nevada population, as determined by the most recent U.S. Census. Id. Second, a particular county's population proportion is then multiplied by 10%

of the voter turnout from the preceding election to determine how many signatures must be

obtained in that county.  Id.

The Nevada Secretary of State has provided an Initiative and Referendum Guide

that demonstrates the required signatures per county under the County Population Rule.

(Intervenor's Mot. at Decl. Todd L. Bice ¶ 6 & Ex. E.)  According to the 2000 U.S. Census,

the total population for Nevada was 1,998,257.  (Def.'s Opp'n to Pls.' Mot. Summ. J. &

Counter Mot. Summ. J. ["Def.'s Mot."], Ex. 1; Intervenor's Mot., Ex. E; Pls.' Mot., Ex. E.)

Examples of Nevada county populations as of 2000 are as follows:  Clark, 1,375,765;

Washoe, 339,486; Eureka, 1,651; and Esmeralda, 971.  (Def.'s Mot., Ex. 1; Intervenor's

Mot., Ex. E;  Pls.' Mot., Exs. F, G, H & I.)  Thus, the proportions of the Nevada population

existing in each of those four counties are 0.6885, 0.1699, 0.00083, and 0.00049,

respectively.  (Def.'s Mot., Ex. 1; Intervenor's Mot., Ex. E.)  Ten percent of the voter

turnout from the 2006 Nevada elections was 58,628 voters.  (Def.'s Mot., Ex. 1;

Intervenor's Mot., Ex. E; Pls.' Mot., Ex. D.)  Therefore, under the County Population Rule,

the number of signatures needed on a ballot initiative petition in each of those five counties

is as follows:  40,364 in Clark County; 9,961 in Washoe County; 49 in Eureka County; and

29 in Esmeralda County.  (Def.'s Mot., Ex. 1; Intervenor's Mot., Ex. E.)

Plaintiffs are various individuals and organizations contesting the County

Population Rule's constitutionality.  (Am. Compl. [Doc. #4] ¶ 4.)  Plaintiff David

McDonough ("McDonough'") is an individual who has signed initiatives in prior election

years.  (Pls.' Reply Mem. P. & A. [Doc. #36] ("Pls.' Reply") at Decl. David McDonough

¶¶ 1, 4.)  Further, at some point during this election year, McDonough signed the "Hemp for

Biomass" Initiative and the "Prevent Employers from Seizing Tips" Initiative.  (Id. ¶ 5.)

However, the proponents of the "Prevent Employers from Seizing Tips" Initiative withdrew

it in August 2008.  (See Def.'s Reply Supp. Mot. Summ. J. (Doc. #46) ["Def.'s Reply"], Ex.

A; Intervenor's Reply Supp. Counter Mot. Summ. J. (Doc. #45) ["Intervenor's Reply"], Ex.

3

2.)  McDonough hopes to sign the "Nevada Taxpayers Protection Act" Initiative, although a Nevada state court since has invalidated this initiative.  (Pls.' Reply at Decl. David McDonough ¶ 6; Intervenor's Reply, Ex. 1.)  McDonough also would like to continue to sign initiative petitions in the future.  (Pls.' Reply at Decl. David McDonough  ¶ 6.)  However, McDonough states that, as a Clark County resident, he feels his vote is worth less than residents of other counties and he no longer will participate in the initiative petition process unless the County Population Rule is invalidated.  (Id. ¶¶ 1, 8-9.)

Similarly, individual Plaintiff Oren Rosen ("Rosen") signed, this year, the "It's Time for Gaming's Fair Share" and "It's Time for Gaming's Fair Share and Eliminate Property Taxes" Initiatives.  (Pls.' Reply at Decl. Oren Rosen ¶ 5.)  However, on February 27, 2008, a Nevada state court ordered both of these initiative petitions removed from the 2008 ballot for impermissibly delegating legislative power and containing multiple subjects. (Def.'s Mot., Ex. 2.)  Rosen also intends to continue signing future Nevada initiative petitions.  (Pls.' Reply at Decl. Oren Rosen ¶ 6.)  Nevertheless, because of the County Population Rule, Rosen avers he is discouraged about the initiative process and he will not participate in it until the law is changed.  (Id. ¶ 9.)  The other two individual Plaintiffs are Kermit Waters ("Waters") and Joseph Zitello ("Zitello").  Although Plaintiffs do not provide affidavits or other evidence as to those two individuals, the Complaint alleges Waters signed the withdrawn "It's Time for Gaming's Fair Share" Initiative, and Zitello intends to sign an initiative petition this year.  (Am. Compl. ¶¶ 11-12.)

Plaintiff Marijuana Policy Project (the "Project") is a non-profit organization, with over 500 Nevada members, that works to remove criminal penalties for reasonable marijuana use, especially for medical purposes.  (Pls.' Reply at Decl. Rob Kampia ¶ 2.)  Plaintiff Committee to Regulate and Control Marijuana (the "Committee") is a registered Nevada political action committee.  (Id. ¶ 3 & Ex. A.)  Since 2002, the Project, through the Nevadans for Responsible Law Enforcement and then through the Committee, has

sponsored three Nevada initiatives, which garnered statewide support. (Id. ¶¶ 4-5.)  The Committee is not currently sponsoring an initiative for the 2008 Nevada ballot because, in part, of the County Population Rule.  (Id. ¶ 6.)   However, if the law is invalidated, the Committee will circulate initiative petitions for future Nevada ballots.  (Id. ¶¶ 7-8.)  Currently, although Nevada Revised Statute § 294A.281 requires organizations to register with the Nevada Secretary of State prior to advocating for or against an initiative, neither the Project nor the Committee is registered as a ballot advocacy group with the Nevada Secretary of State.  (Intervenor's Mot., Ex. A.)

The final Plaintiff is the American Civil Liberties Union of Nevada ("ACLUN"). A core principle of the ACLUN is to protect the right of all citizens to have their votes count equally, which is a principle the ACLUN previously has challenged in court.  (Pls.' Reply at Decl. Gary Peck ¶¶ 5-7.)  Further, ACLUN members previously have participated in the Nevada ballot initiative process, and members in Clark County and Washoe County signed initiative petitions intended for the 2008 ballot.  (Id. ¶ 8.)  Currently, the ACLUN is not registered as a ballot advocacy group with the Nevada Secretary of State.  (Intervenor's Mot., Ex. A.)

On February 14, 2008, Plaintiffs filed this 42 U.S.C. § 1983 action against Defendant Miller, Nevada Secretary of State.  Plaintiffs claim the County Population Rule violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.  (Am. Compl. ¶¶ 32-44.)  Plaintiffs seek an order declaring the County Population Rule unconstitutional and enjoining its enforcement. Plaintiffs and Defendant stipulated to the intervention of Defendant-Intervenor Nevada Resort on July 1, 2008.  (Stip. & Agreem. Allow. Interv. by Nev. Resort Ass'n [Doc. #28].) Plaintiffs now move for summary judgment on their Equal Protection claim, and Miller and Nevada Resort both countermove for summary judgment, also based solely on the Equal Protection claim.  Plaintiffs claim the County Population Rule violates the one person, one

vote rule under the Equal Protection Clause.  Defendants argue Plaintiffs lack standing and their claims are moot and not ripe.  Defendants also assert the County Population Rule satisfies one person, one vote.

Finally, We the People Nevada ("WTP") moves to intervene as a Plaintiff.  (Mot. to Interv. at 1.)  WTP is a registered ballot advocacy group that seeks to intervene to protect and preserve its rights regarding its "Nevada Property Tax Restraint" Initiative petition. (Id., Ex. A.)  At the hearing on this matter, the parties represented to the Court that a Nevada state court recently invalidated some of the signatures on the initiative, and the dispute over these signatures is pending in the Nevada Supreme Court.

**II. LEGAL STANDARD**

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Jespersen v. Harrah's Operating Co., Inc., 392 F.3d 1076, 1079 (9th Cir. 2004) (citing Far Out Prods., Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 2001)).  Further, this Court views all evidence in the light most favorable to the non-moving party.  Id.

Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  After the moving party has met its burden, the burden then shifts to the non-moving party to produce some evidence that a genuine issue of material fact remains for trial.  Id. (citing Liberty Lobby, 477 U.S. at 248-49).

///

///

### III. JUSTICIABILITY

Defendant Miller argues Plaintiffs lack standing because they have alleged nothing more than a hypothetical intent to circulate or sign an initiative petition, or have signed a withdrawn petition.  Miller also argues signing a currently-circulating petition months after the filing of the Amended Complaint does not confer standing because standing is determined at the time the complaint is filed.  Similarly, Miller argues Plaintiffs' claims are not ripe because Plaintiffs only intend to sign or circulate a petition at some point in the future.  Miller also claims Plaintiffs will experience no hardship if they have to wait to bring a claim until they attempt to place an initiative petition on the ballot.

Defendant-Intervenor Nevada Resort claims the individual Plaintiffs lack standing because the County Population Rule is a requirement for ballot proponents, not signers.  Nevada Resort also argues the individual Plaintiffs' claims have become moot because the two initiatives they had claimed to sign were invalidated by a Nevada state court.  Nevada Resort claims Plaintiff ACLUN fails to allege any actual or imminent harm to it or its members because its members do not allege any specific plans to sign or work on a future initiative petition, it has not proposed any initiatives for the 2008 ballot, and has not registered as a ballot advocacy group.  Finally, Nevada Resort claims the Project and the Committee lack standing because they cannot credibly claim they intend to propose Nevada ballot initiatives or that the County Population Rule will be enforced against them if they have not registered as a Nevada ballot advocacy group.

Plaintiffs respond that the individual Plaintiffs have signed initiative petitions in the past, have signed petitions now in circulation, and intend to sign petitions in the future.  Plaintiffs argue the individuals have standing because they have been injured as their signatures on initiative petitions have and will continue to be valued less than voters in less-populated counties.  As such, Plaintiffs claim, the County Population Rule interferes with their ability to petition the government and has caused them to be disinclined to continue

participating in the initiative process.  Plaintiffs also deny their case is moot but, even if the claims based on initiative petitions removed from circulation have become moot, Plaintiffs argue McDonough has standing now because he has signed two initiatives currently in circulation.

Further, Plaintiffs claim the ACLUN has standing because its members have a right to have their petition signatures count equally, many members participate in the Nevada initiative process, and it has demonstrated a commitment to fair elections by filing several cases on behalf of its members.  Finally, Plaintiffs argue the Project and the Committee have standing because they have sponsored and intend to sponsor initiative petitions in Nevada, and the County Population Rule interferes with their ability to promote legislative change through initiatives.  Plaintiffs also claim the Committee has not registered as a ballot advocacy group because it is not advocating a petition this year, although it demonstrates its intent to continue participating in the process by maintaining its political action committee registration.

Plaintiffs argue their claims are ripe because hardship will result if a decision is postponed.  Specifically, Plaintiffs claim they will not have adequate opportunity for complete judicial review before the November 2008 election if a decision is delayed until signatures are tallied and an initiative fails to qualify, and they are entitled to know the rules governing a process before entering it.  Plaintiffs also claim hardship exists because the threat that Defendant Miller will enforce the statute is evident as the State, through its Initiative Guide, made it clear it will enforce the County Population Rule.  Finally, Plaintiffs claim the facts are sufficiently developed to allow for judicial review because this is a purely legal question and no additional facts would be helpful.

**A.  Standing**

The case or controversy requirement of Article III, § 2 of the United States Constitution underpins the standing doctrine.  <u>Lomax</u>, 471 F.3d at 1015-16.  Standing

depends on "whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy, and serves to ensure that legal questions presented to the court will be resolved in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." Hall v. Norton, 266 F.3d 969, 975 (9th Cir. 2001) (quotations, alterations, and internal citation omitted).  Generally, in a federal action with multiple plaintiffs, once the court determines one plaintiff has standing, it need not decide the standing of others.  Council of Ins. Agents & Brokers v. Molasky-Arman, 522 F.3d 925, 932-33 (9th Cir. 2008).   When evaluating standing, the court looks to the facts "as they exist at the time the complaint was filed." Lomax, 471 F.3d at 1015.     The party invoking federal jurisdiction has the burden to establish standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  Further, when a plaintiff seeks declaratory or injunctive relief, the plaintiff must demonstrate it is "realistically threatened by a repetition of the violation." Gest v. Bradbury, 443 F.3d 1177, 1181 (9th Cir. 2006) (quotation omitted).  "[A]t the summary judgment stage the plaintiffs need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." Truth v. Kent Sch. Dist., 524 F.3d 957, 965 (9th Cir. 2008) (alteration in original) (quotation omitted).  However, at the summary judgment stage, the plaintiff cannot rely on mere allegations of injury and must set forth specific facts, by affidavit or other evidence. Defenders of Wildlife, 504 U.S. at 561.

To establish standing under Article III of the Constitution, a plaintiff must show "(1) injury in fact; (2) causation; and (3) likelihood that the injury will be redressed by a favorable decision." Lomax, 471 F.3d at 1015.

1.  Injury-in-Fact

A plaintiff's alleged injury-in-fact must be "to a legally protected interest that is both 'concrete and particularized' and 'actual and imminent,' as opposed to 'conjectural' or 'hypothetical.'" LSO, Ltd. v. Stroh, 205 F.3d 1146, 1152-53 (9th Cir. 2000) (quoting San

Diego Gun Rights Comm. v. Reno, 98 F.3d 1121, 1126 (9th Cir. 1996)).  "'[S]ome day'
intentions–without any description of concrete plans, or indeed even any specification of
when the some day will be–do not support a finding of the 'actual or imminent' injury that
our cases require."  Defenders of Wildlife, 504 U.S. at 564.  For instance, in Thomas v.
Anchorage Equal Rights Comm'n,[1] prosecution of a rental housing statute was not
imminent as it depended on unforeseeable events such as whether plaintiffs would rent their
property, whether an unmarried couple would attempt to rent and be denied, and whether
that couple would file a complaint that actually was prosecuted.  220 F.3d 1134, 1141 (9th
Cir. 2000) (en banc); see also Cole v. Oroville Union Sch. Dist., 228 F.3d 1092, 1100 (9th
Cir. 2000) (holding students and parents contesting a high school policy against sectarian
speeches at graduation lacked standing because of "the highly speculative assumption" that
a student seeking to give such a speech would be chosen as valedictorian or salutatorian and
elected to deliver a speech).

     Nevertheless, "[i]t is sufficient for standing purposes that the plaintiff intends to
engage in a course of conduct arguably affected with a constitutional interest and that there
is a credible threat that the challenged provision will be invoked against the plaintiff."
LSO, Ltd., 205 F.3d at 1154-55 (quotation omitted).  When the potential enforcement of the
challenged statute implicates First Amendment rights, "the inquiry tilts dramatically toward
a finding of standing."  Id. at 1155.  In fact, "self-censorship" from fear of prosecution is "a
harm that can be realized even without actual prosecution."  Id.  For example, in ACLU of
Nevada v. Heller, the ACLU had standing to bring a First Amendment challenge to a statute
requiring disclosure of the financial sponsor of election publications discussing candidates
or initiatives because the ACLU and its members previously had been prosecuted and
wished to engage in this speech in the future.  378 F.3d 979, 983-84 (9th Cir. 2004); see

---

[1] The Ninth Circuit in Thomas analyzed injury under a ripeness inquiry but noted the analysis is the same as it would be for standing.  220 F.3d at 1138-39.

also Ariz. Right to Life Political Action Comm. v. Bayless, 320 F.3d 1002, 1005-07 (9th Cir. 2003) (holding political action committee had standing to challenge a law placing limitations on the timing of political advertising because plaintiff had to modify its speech or face civil penalties).

Petition circulation "is core political speech, because it involves interactive communication concerning political change." Buckley v. Am. Constitutional Law Found. Inc., 525 U.S. 182, 186 (1999) (quotations omitted). An organization that circulates an initiative that fails to qualify for the ballot due to the potentially unconstitutional rule clearly has standing to challenge that rule. Lomax, 471 F.3d at 1015. However, that is not the only way a plaintiff may have standing to challenge such a rule. For instance, the district court in Idaho Coalition United for Bears v. Cenarrusa found standing where the individual plaintiffs previously had circulated ballots and intended to do so in the future, although they had none circulating, because, as they were well-known for their initiative work and had full control over whether they would engage in the initiative process, their statements of future intent were neither hypothetical nor speculative. No. Civ.00-0668-S-BLW, 2001 WL 34050705, at *1-2 (D. Idaho 2001) (unpublished). The Ninth Circuit affirmed the district court's ruling on the merits, although the Court did not address standing. Idaho Coalition United for Bears v. Cenarrusa, 342 F.3d 1073 (9th Cir. 2003).

Similarly, the Tenth Circuit held plaintiffs had standing to bring a First Amendment facial challenge to a Utah constitutional provision requiring wildlife initiatives receive two-thirds of the votes at the election, whereas other initiatives needed only a majority. Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1085 (10th Cir. 2006) (en banc). The court noted most cases involving a chilling effect on speech occur when a plaintiff faces criminal prosecution for certain forms of speech or conduct. Id. at 1088. However, in Walker, the issue was whether the state constitutional provision represented a "credible threat" of "real consequences" to plaintiffs. Id.

The court provided three factors to consider to determine if plaintiffs suffered an injury-in-fact:

> (1) the evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so <u>because of</u> a credible threat that the statute will be enforced.

<u>Id.</u> at 1089.  The court held the plaintiff organizations had standing because they were "among the direct targets of the state constitutional change, . . . there [were] no doubts about whether the challenged provision will be enforced against them, and . . . they ha[d] submitted satisfactory evidence of the chilling effect on their speech."  <u>Id.</u> at 1097.

The mere existence of a potentially unconstitutional statute does not necessarily create a "case or controversy" under satisfy Article III.  <u>Thomas</u>, 220 F.3d at 1139.  Likewise, a plaintiff with a generalized grievance about government actions does not have a particularized injury and lacks standing.  <u>LSO, Ltd.</u>, 205 F.3d at 1153.  Nonetheless, a plaintiff still might have standing to challenge a government action when that action is not directed toward the plaintiff.  <u>Id.</u> at 1154.  For example, in <u>LSO, Ltd.</u>, the Ninth Circuit held a plaintiff had standing to contest a state's regulatory actions against liquor licensees because the regulatory actions affected the plaintiff's ability to host an erotic art convention at the liquor licensee's facilities.  <u>Id.</u>  This was not a generalized grievance because the state's actions allegedly interfered with plaintiff's First Amendment rights.  <u>Id.</u>  In making this holding, the <u>LSO, Ltd.</u> Court analogized to <u>Bantam Books, Inc. v. Sullivan</u>, in which the United States Supreme Court similarly held that a state action directly affecting book distributors still could be challenged by publishers who suffered a "palpable injury" when the state action impaired circulation of their books.  <u>Id.</u> at 1153 (citing 372 U.S. 58, 59-63, 64 n.6 (1963)).

No issue of material fact remains that Plaintiffs the Project and the Committee

have established an injury-in-fact because they have circulated initiative petitions in the

past, state they intend to do so in the future, and they are not currently doing so at least in

part due to the County Population Rule.  The Project and Committee also have full control

of whether they will do so in the future.[2]  Unlike the situations in <u>Thomas</u> and <u>Cole</u>,

whether the Project or Committee will circulate an initiative petition does not require a

hypothetical action by a third party.  Instead, the Project and Committee's intent to circulate

future initiatives is not speculative as they, through affidavit of their Executive Director,

state an intent to do so in the future and Defendants do not contest this intention.

The County Population Rule interferes with the Project and Committee's core

political speech because it makes it more difficult to advocate for political change.

Plaintiffs stated the Rule has deterred their participation and they should be able to know

the requirements for gathering signatures before starting the initiative process.  Whether the

County Population Rule is constitutional will affect strategy and allocation of resources in

gathering signatures.  Consequently, the Project and Committee do not have to wait until an

initiative petition is invalidated by the County Population Rule before they can challenge

the injury the County Population Rule is causing to their ability to engage in core political

speech.  Analogizing to the Tenth Circuit's test, the standing of the Project and the

Committee is strengthened further because the Executive Director of the two organizations

alleges the Project, through the Committee, previously circulated petitions and the

Committee intends to do so in the future, although it will not until the Rule is invalidated.

Thus, the Project and Committee have established injury-in-fact.

///

Further, although the Court need decide the standing of only one Plaintiff, no

genuine issue of material fact remains that individual Plaintiff Rosen and the ACLUN

[2]  Defendants noted at the hearing that no discovery has occurred.  However, Defendants did not move under Federal Rule of Civil Procedure 56(f) to defer a ruling pending discovery and did not file a Rule 56(f) affidavit in support.

members have established injury-in-fact because the alleged constitutional violation, vote dilution, occurs immediately upon signing a petition.  Specifically, the injury to a voter occurs whether an initiative petition passes or not because a vote is valued less as soon as it is cast.  Plaintiff Rosen stated by affidavit that he had signed two 2008 initiative petitions by the time the Complaint was filed.  Defendants do not contest that Rosen signed these petitions.  Although those both were removed from circulation, his claims are not moot because the "capable of repetition, yet evading review" exception applies.[3]  Because the initiative process is inherently short and the Secretary of State does not claim he will not continue enforcing the County Population Rule, Rosen would be subjected to it again as soon as he signs another petition, which by affidavit he avers he intends to do.  Additionally, Rosen and McDonough stated by affidavit that, because of the alleged vote dilution, they are discouraged from signing initiatives until the County Population Rule is invalidated.  This self-censorship further strengthens Rosen's standing.  The ACLUN members also have established standing because, as asserted by the ACLUN's Executive Director, they previously have participated in the Nevada ballot initiative process and members in Clark and Washoe Counties signed initiative petitions intended for the 2008 ballot.  Thus, the ACLUN members establish injury by the same alleged vote dilution as Rosen experienced.

///

Finally, the Court rejects Nevada Resort's argument that the individual Plaintiffs do not have standing because the County Population Rule applies only to petition

---

[3]   Mootness is the "doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  Vasquez v. Los Angeles County, 487 F.3d 1246, 1253 n.6 (9th Cir. 2007) (quotation omitted).  However, a claim is not moot if it is "capable of repetition, yet evading review."  Lomax, 471 F.3d at 1017.  This exception applies if "(1) the challenged action is too short in duration to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will again be subject to the same action."  Id.

14

circulators, not signers.  In fact, the individual signers, like the plaintiffs in LSO, Ltd. and Bantam Books, are directly affected by the state action.  Although the statute does not stop a voter from signing an initiative petition, if Plaintiffs are correct that the County Population Rule violates the Equal Protection Clause, the enforcement affects the individuals' voting rights.  Thus, the individual Plaintiffs' claims are not generalized grievances.

### 2.  Causation and Redressability

Causation is established if the plaintiff's injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Pritikin v. Dep't of Energy, 254 F.3d 791, 797 (9th Cir. 2001)  (alterations in original) (quotation omitted).   As for redressability, "it must be likely as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Id. at 797 (quotations omitted).  Here, causation exists because the alleged injuries derive directly from the County Population Rule, which is enforced by Defendant Miller, as the Nevada Secretary of State.  Redressability also exists because, as the alleged injury is a result of enforcement of the County Population Rule, invalidation of the Rule would redress Plaintiffs' injuries.  Accordingly, because at least the Project, the Committee, individual Plaintiff Rosen, and the ACLUN[4] establish the three elements of standing,

---

[4]   The ACLUN also needs to establish organizational standing to sue on behalf of its members.  An organization "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Nat. Res. Def. Council v. EPA, 526 F.3d 591, 601-02 (9th Cir. 2008) (quotation omitted).

Here, the ACLUN members have standing based on their alleged vote dilution.  Those voting interests are germane to the ACLUN's purposes because, as stated by its Executive Director, one of the ACLUN's core principles is to protect the rights of all citizens to have their votes count equally.  Finally, neither the claim nor relief requires the participation of the ACLUN's members because those interests are adequately represented by the ACLUN and the ACLUN requests only injunctive and declaratory relief.  Thus, no genuine issue of material fact exists as to the ACLUN's organizational standing .

Plaintiffs have standing to bring this suit.

**B. Ripeness**

"[R]ipeness is peculiarly a question of timing designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Thomas, 220 F.3d at 1138 (citation and quotations omitted). The ripeness doctrine contains both a constitutional component derived from Article III limitations on judicial power and a prudential component. Id. The constitutional component of the ripeness inquiry is similar in scope and often coincides with standing's injury-in-fact analysis. Id. The plaintiff's injury must be "definite and concrete, not hypothetical or abstract," and the plaintiff must face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Id. at 1139 (quotations omitted). Injury that is "too imaginary or speculative" will not support a finding of ripeness. Id. (quotations omitted). For the prudential component of ripeness, the Court considers the hardship to the parties if the Court declines to address the matter and whether the issues are fit for judicial review. Id. at 1141.

Plaintiffs' equal protection claims are ripe. Plaintiffs have established injury, and, therefore, Plaintiffs meet the constitutional component of ripeness. The hardship to the Project and the Committee if the Court declines to address the matter is that they will be forced to expend significant resources in initiating and circulating a petition without knowing whether they must comply with the County Population Rule. Although the County Population Rule does not stop them from initiating a petition, it affects the Project and the Committee's ability and strategy to gather signatures in Nevada. If the Project and the Committee wait to challenge the County Population Rule until an initiative petition is invalidated by the Rule and the challenge is successful, they will expend resources to comply with an invalid Rule.

Additionally, for the individual Plaintiffs and ACLUN members, they experience

hardship in that the alleged vote dilution occurs upon signing, which some individual Plaintiffs have done this year.  Further, both McDonough and Rosen allege they are discouraged from signing another petition until the Rule is invalidated.  Thus, they suffer another hardship in the sense that the Rule deters them from participating in the ballot initiative process.

The issues also are fit for judicial review because no additional facts would help the Court make a decision.  The dispute over the County Population Rule is a purely legal issue as to whether the statute on its face violates the Equal Protection Clause.  Therefore, Plaintiffs' equal protection claim is ripe.

**IV.  EQUAL PROTECTION**

Plaintiffs argue the County Population Rule violates the one person, one vote rule of the Equal Protection Clause because the Rule, like the previous 13 Counties Rule invalidated by the Ninth Circuit, favors residents of sparsely-populated counties over those in densely-populated counties, thereby diluting votes in urban areas.  Plaintiffs claim that because Nevada granted equal power to counties of unequal population, as opposed to equally populated geographic units, such as legislative districts, the County Population Rule is unconstitutional under the Fourteenth Amendment of the Constitution.

Defendant Miller argues the County Population Rule does not violate the one person, one vote rule because it allocates an initiative's required number of signatures in accordance with each county's population in proportion to Nevada's population as a whole. Miller also argues the Ninth Circuit, when invalidating the 13 Counties Rule, held unconstitutional only those rules requiring fixed percentages of signatures for a fixed number of counties, not proportional rules.  Miller contends the County Population Rule furthers a compelling state interest in maximizing participation in the initiative process that does not unduly burden Plaintiffs, while Plaintiffs' legislative district suggestion would require gathering signatures in over 20 assembly or 12 senate districts in Clark County

1    alone.  Finally, Miller argues a signature requirement based on state assembly districts

2    would disenfranchise voters of rural counties because votes could be collected without any

3    support from registered voters in 12 of the 17 Nevada counties.

4            Defendant-Intervenor Nevada Resort similarly argues the County Population

5    Rule is constitutional because voters in different counties exert the same level of influence

6    in proportion to their county's share of the Nevada population.  Nevada Resort also argues

7    no case law makes the use of counties per se impermissible and the use of assembly districts

8    was only a suggestion by the Ninth Circuit, not a requirement.  Nevada Resort also claims

9    the County Population Rule functions nearly identical to a system based on assembly

10   districts because of the weight given to each county based on population.  For example, if

11   assembly districts were used, each assembly district would need 1,396 signatures to meet

12   the 10% signature requirement of the Nevada Constitution (calculated by dividing 10% of

13   the past election voter turnout, 58,628, by 42 assembly districts).  (See Intervenor's Mot. at

14   Exs. D, E, F; Def.'s Mot., Ex. 3.)  In Clark County, which has 29 assembly districts, a

15   petition would need 40,484 signatures (1,396 multiplied by 29).  (See id., Exs. D, F; Def.'s

16   Mot., Ex. 3.)  As the County Population rule requires 40,364 votes in Clark County, there is

17   a difference of only 120 signatures between the two systems.  Finally, Nevada Resort

18   argues that a rule based on Nevada assembly or senate districts would increase significantly

19   the burden on initiative proponents collecting signatures and those verifying signatures

20   because of the difficulty of distinguishing between voters in different districts when the

21   border of those districts is often indistinguishable, as, for example, there are 29 assembly

22   districts in Clark County alone.

23   ///

24           To establish a claim under 42 U.S.C. § 1983, the plaintiff must show state action

25   and a constitutional violation.  Broam v. Bogan, 320 F.3d 1023, 1028 (9th Cir. 2003).  Here,

26   only the constitutional violation is at issue.  Under the Equal Protection Clause of the

Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The United States Supreme Court has interpreted this to require all participants in an election have an equal vote, regardless of where their home is in a geographical unit.  Gray v. Sanders, 372 U.S. 368, 379 (1963). The only weighting of votes allowed under the Constitution is allocating U.S. Senators regardless of population and the use of the electoral college in choosing the President.[5]  Id. at 380.  As such, "if a State should provide that the votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted."  Reynolds v. Sims, 377 U.S. 533, 562 (1964).  In other words, "[t]he conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing - one person, one vote."  Sanders, 372 U.S. at 381.

The Supreme Court applied the one person, one vote concept to a county vote counting system in Gray v. Sanders and to a state legislature apportionment scheme in Reynolds v. Sims.  In Sanders, the Supreme Court invalidated a Georgia "county unit system" for counting votes in primaries for the state legislature and U.S. Senate.  Id. at 370, 381.  Under the original doubling system, a candidate receiving the highest number of votes in a county carried that county, thereby receiving two votes for each representative that county had in the state assembly.  Id. at 371.  An amended "bracket" system allocated

---

[5]  The Supreme Court noted analogies to the electoral college are inapposite to state voting arrangements because the electoral college was adopted with specific historical concerns during the adoption of the U.S. Constitution, while no such constitutional validation exists for statewide voting. Id. at 378.

voting units based on each county's bracket of population.[6] Id. at 372.  The Court held both violated equal protection, noting that even if the "bracket" system units were allocated strictly proportional to population, the winning candidate receives a full unit after winning a majority of the popular vote, thereby making the votes for other candidates worth nothing. Id. at 381 & n.12.

In Reynolds, the Court invalidated an Alabama state legislature apportionment scheme that had not been updated to reflect population changes, as well as two plans to change that scheme in which each county received one seat and the other seats were distributed proportionally to the counties based on population.  377 U.S. at 543-45. Specifically, a proposed Alabama constitutional amendment divided the remaining seats by an "equal proportions" method (as used in apportioning seats of the U.S. House of Representatives), and an enacted statute divided the remaining seats based on a "formula requiring increasingly more population for a county to be accorded additional seats." Id. The Court held all three plans violated equal protection because the houses of a state legislature must be apportioned on a population basis.  Id. at 569.  Although the Court noted the proposed amendment was the closest plan to reaching the constitutional standard, it concluded "the deviations from a strict population basis [were] too egregious to permit [the Court] to find that [the Alabama House] . . . was apportioned sufficiently on a population basis so as to permit the arrangement to be constitutionally sustained." Id. (concluding that "[w]hile mathematical nicety is not a constitutional requisite," population variances of close to 5 to 1 violated equal protection).

The Supreme Court expanded the one person, one vote concept to signature

---

[6]  For example, a county with a population up to 15,000 had 2 units; one with a population between 15,000 and 20,000 had 3 units; one with a population between 20,000 and 30,000 had 4 units; one with a population between 30,000 to 45,000 had 5 units; one with a population of 45,000 to 60,000 had 6 units; and each additional 30,000 persons above 60,000 gave a county two additional units.  Id. at 372.

collection on nominating petitions in <u>Moore v. Ogilvie</u>.  394 U.S. 814, 818 (1969).  The

Court concluded nominating petitions are integral to a state's election system, and,

therefore, a state's procedures for nominating petitions must pass muster under the

Constitution.  <u>Moore</u>, 394 U.S. at 818.  In <u>Moore</u>, the Supreme Court held unconstitutional

an Illinois statute that required signatures of 200 qualified voters from each of a minimum

of 50 counties before an independent candidate could be placed on the ballot for President

and Vice President of the United States.  <u>Id.</u> at 815.  The Court held this law violated equal

protection because it discriminates against populous counties in favor of rural counties:

> It is no answer to the argument under the Equal Protection Clause that this law
> was designed to require statewide support for launching a new political party
> rather than support from a few localities.  This law applies a rigid, arbitrary
> formula to sparsely settled counties and populous counties alike, contrary to
> the constitutional theme of equality among citizens in the exercise of their
> political rights.  The idea that one group can be granted greater voting strength
> than another is hostile to the one man, one vote basis of our representative
> government.

<u>Id.</u> at 818-19.

The Ninth Circuit adopted the one person, one vote reasoning of <u>Moore</u> to ballot

initiatives in <u>Idaho Coalition United for Bears v. Cenarrussa</u> and applied it to Nevada law in

<u>ACLU of Nevada v. Lomax</u>.   In <u>Idaho Coalition</u>, the Ninth Circuit applied strict scrutiny

and held unconstitutional an Idaho statute requiring a ballot petition sponsor to obtain

signatures from at least six percent of the qualified voters in at least half of the 44 counties

in Idaho.  342 F.3d 1073, 1075-77, 1079 (9th Cir. 2003).  Because Idaho's counties varied

greatly in population, the Idaho statute allocated equal power to counties of unequal

population.  <u>Id.</u> at 1078.  Specifically, in the smallest Idaho county, a person's vote would

count when only 61 others sign the petition, whereas, in the largest county, it would take

18,054 signatures before a person's vote would count.  <u>Id.</u>  The Ninth Circuit held this

violated equal protection because a system to place initiatives on the ballot "may not be

based on treating unequal counties equally and making the electoral determination

dependent on the support of numbers of counties rather than numbers of people."  <u>Id.</u>

Applying strict scrutiny, the Ninth Circuit rejected Idaho's arguments as unpersuasive, or, at a minimum, not narrowly tailored to further Idaho's interests.  Id.  First, Idaho argued it had a greater interest in protecting against localized legislation than Illinois did in requiring statewide support for placing a new political party's presidential elector on the ballot in Moore.  Id. at 1077-78.  The Ninth Circuit disagreed and held that, even if the state's interest was compelling, the current statute was not narrowly tailored to promote such an interest because Idaho could achieve the same end by, for example, "basing any such requirement on existing state legislative districts."  Id. at 1078.  Second, Idaho argued it was interested in preventing long and confusing lists of initiatives on the ballot, preventing fraud, informing the voters, ensuring integrity in the ballot process, and promoting grassroots direct legislation.  Id. at 1079.  The Court concluded that, even if these were all valid purposes, each could be advanced by a system that treats voters equally across geographic areas, such as increasing the number of statewide signatures required.  Id.  Finally, addressing Idaho's interest in creating a check on the majority's will, the Ninth Circuit stated Idaho still could do this by non-discriminatory means that do not "weigh the votes (or signatures) of some voters more heavily than those of others."  Id.

In Lomax, the Ninth Circuit invalidated the Nevada 13 Counties Rule, which required a petition have signatures from 13 of the 17 Nevada counties.  471 F.3d at 1013, 1021.  Applying Idaho Coalition, the Court held the 13 Counties Rule violated equal protection as it diluted the votes of residents in densely populated counties.  Id. at 1019. Although a higher percentage was required in the Nevada rule than in the Idaho rule and the Court suggested in Idaho Coalition that increased percentages might alleviate equal protection concerns, the Court stated such an increase was suggested "in lieu of, rather than in conjunction with, a county-based requirement."  Id. at 1020 (emphasis omitted).  In fact, "[a] general statewide increase of the fixed percentage requirement does not resolve the constitutional infirmities resulting from a system that dilutes the power of some votes by

providing more sparsely populated counties with the same total power as densely populated counties." Id. Finally, applying strict scrutiny, the Ninth Circuit expressed skepticism that the state has a compelling interest in ensuring statewide support for ballot initiatives; however, even assuming that interest was valid, the 13 Counties Rule was not narrowly tailored, as Nevada could base a rule on legislative districts. Id. at 1021.[7]

Although not all voting regulations receive strict scrutiny review, strict scrutiny applies to "regulations that contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit." Green v. City of Tucson, 340 F.3d 891, 896, 899-900 (9th Cir. 2003). Further, Idaho Coalition and Lomax applied strict scrutiny to determine whether ballot initiative petition requirements diluted the vote of certain voters based on where they live in the state. Therefore, under strict scrutiny, Nevada has the burden of showing the County Population Rule is "narrowly tailored to achieve a compelling state interest." Nader v. Brewer, 531 F.3d 1028, 1035, 1037 (9th Cir. 2008).

---

[7] Other courts have applied similar analyses. See, e.g., Blomquist v. Thomson, 739 F.2d 525, 527-28 (10th Cir. 1984) (holding unconstitutional Wyoming's rule requiring a minimum of 8,000 signatures, the majority of which cannot reside in the same county, because the state did not justify the burdens on constitutional rights); Communist Party of Ill. v. State Bd. of Elections, 518 F.2d 517, 518, 521-22 (7th Cir. 1975) (holding that Illinois statute requiring political parties seeking ballot recognition to obtain 25,000 signatures, not more than 13,000 from any one county, violated equal protection because it discriminates against voters in populous counties and was not narrowly tailored); Mont. Pub. Interest Research Group v. Johnson, 361 F. Supp. 2d 1222, 1224-25, 1230 (D. Mont. 2005) (finding unconstitutional Montana's statute that required an initiative petition receive signatures from 5% of voters in half of Montana's unequally populated counties because, applying strict scrutiny and Idaho Coalition, it resulted in unequal treatment of voters and was not narrowly tailored to Montana's objectives); Gallivan v. Walker, 54 P.3d 1069, 1076, 1096 (Utah 2002) (invalidating Utah initiative petition requirement to obtain signatures from 10% of voters during last election in at least 20 of Utah's 29 counties because it violates equal protection). But see Libertarian Party v. Bond, 764 F.2d 538, 539, 544 (8th Cir. 1985) (upholding Missouri statute for placing a new political party's candidate on the ballot by requiring signatures of 1% in each or 2% in one-half of Missouri's congressional districts), cited in Idaho Coalition, 342 F.3d at 1079 (distinguishing Idaho's statute because the Missouri statute related to divisions of equal population); Petition of Berg, 713 A.2d 1106, 1109 (Pa. 1998) (upholding Pennsylvania statute requiring 100 signatures from 10 of the state's 67 counties because, among other reasons, a "scant minority of voters in rural areas could [not] 'veto' the wishes of the majority"), cited in Idaho Coalition, 342 F.3d at 1079 (distinguishing Berg because Pennsylvania's counties were more evenly populated).

Here, Miller and Nevada Resort put forth two justifications for the County Population Rule.[8]  First, Defendants claim the Rule is necessary to ensure statewide support for a ballot initiative and to prevent urban areas from dominating the initiative process.  The Courts in Moore, Idaho Coalition, and Lomax suggest this is not a compelling interest because, as stated in Moore, "[i]t is no answer to the argument under the Equal Protection Clause that this law was designed to require statewide support . . . ."  394 U.S. at 818. However, the Ninth Circuit in Idaho Coalition concluded only that this interest is not greater than the interest of ensuring statewide support for a new political party placing presidential electors on the ballot advanced in Moore.  The Ninth Circuit did not necessarily hold that it is not a compelling interest.  Both Idaho Coalition and Lomax instead focus more on the narrowly tailored aspect of strict scrutiny.  Thus, although the Ninth Circuit has suggested this interest is not compelling, it has not held it could never be compelling.  Nevertheless, instead of explaining why statewide support for initiatives is a compelling state interest, Defendant Miller argues only that other initiative petition schemes might allow signatures to be collected in relatively few counties.  Thus, Miller has not met his burden of proving statewide support is a compelling state interest.

Even if statewide support is a compelling government interest, the County Population Rule is not narrowly tailored to serve that objective.  As in Lomax, one voter's vote in Clark County under the County Population Rule weighs substantially less than one voter's vote in any other Nevada county.  In Idaho Coalition, it took only 61 others to sign for a person's vote to count in the smallest county, whereas it took 18,054 others to sign for a vote to count in the largest county.  Similarly, here, it would take 40,363 other voters to sign a petition before a Clark County voter's vote would "count," whereas it would only take 28 other voters to sign in Esmeralda County.  Because a petition supporter must obtain

---

[8]  Plaintiffs do not contest that either of these interests are compelling.  Rather, Plaintiffs focus on whether the County Population Rule is narrowly tailored.

signatures from every county, each county is treated equally.  Therefore, the Rule is based on numbers of counties not numbers of people.  As the <u>Idaho Coalition</u> and <u>Lomax</u> Courts held, a system that gives counties of unequal population equal power violates equal protection.

Further, the Ninth Circuit provided at least one possibility, using state legislative districts, that would alleviate equal protection concerns.  Miller argues such a scheme would allow an initiative petition to get on the ballot with support from only a small number of counties.  However, because the Ninth Circuit stated a ballot rule cannot be made "on the support of numbers of counties rather than numbers of people," statewide support cannot be addressed in terms of gaining support from enough counties.  <u>Idaho Coalition</u>, 342 F.3d at 1078.  Moreover, although signatures could be gathered from less than all counties, even if this happens, the initiative proponent still would need some of the signatures from rural counties.  In other words, even though an initiative supporter theoretically could obtain signatures from less than all of the Nevada counties, the urban voters could not dominate the process.  Thus, because an alternative system based on legislative districts would not violate equal protection and would ensure relatively broad statewide support including some rural voters, Defendants do not meet their burden of proving the County Population Rule is narrowly tailored to further Nevada's interest in statewide support for initiatives.

Defendant-Intervenor Nevada Resort's second justification for the County Population Rule is to ensure a manageable initiative system for initiative petitioners and the State.  Specifically, Nevada Resort argues that using state legislative districts would make the process exceedingly difficult because signature collectors and verifiers would need to distinguish between voters in different districts that randomly cross urban areas.  Miller also notes the large number of assembly or senate districts in Nevada, especially in Clark County.  This manageability concern is a more compelling reason why using state legislative districts, as opposed to counties, is not a reasonably functional system.  In fact, as the right

to circulate initiatives is a right provided by the Nevada Constitution, Nevada has a compelling interest in making sure that right realistically can be supported by the government and realized by Nevada voters.

However, even if the manageability concerns are compelling, the State still must show the County Population is narrowly tailored to that interest.  Although state legislative districts might make managing the initiative process more difficult, it is not clear that they would and neither Miller nor Nevada Resort demonstrate it is unduly burdensome to use these divisions.  Further, other divisions could satisfy both equal protection and the State's interests.  For example, Nevada has significantly fewer state senate districts than assembly districts, thereby lessening manageability concerns.  Additionally, using United States congressional districts would not have the same manageability concerns.  Because Defendants do not meet their burden of showing the County Population Rule is narrowly tailored to serve its interests and the Rule violates one person, one vote, no genuine issue of material fact exists that the County Population Rule violates the Equal Protection Clause. The Court therefore will grant Plaintiffs' Motion for Summary Judgment and deny Defendant Miller's and Defendant-Intervenor Nevada Resort's Motions for Summary Judgment.  Further, the Court declares the County Population Rule in Nevada Revised Statute § 295.012 unconstitutional and enjoins Defendant Miller from enforcing the County Population Rule.

**V.  MOTION TO INTERVENE**

WTP moves to intervene as a Plaintiff under Federal Rule of Civil Procedure 24(a) as a matter of right, or, in the alternative, to intervene permissively under Rule 24(b). However, because the Court is granting Plaintiffs' Summary Judgment motion, WTP's motion to intervene is hereby denied as moot.

**VI.      CONCLUSION**

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment

(Doc. #16) is hereby GRANTED.  Judgment is hereby entered in favor of Plaintiffs and against Defendant Miller.

IT IS FURTHER ORDERED that Defendant Miller's Countermotion for Summary Judgment (Doc. #24) is hereby DENIED.

IT IS FURTHER ORDERED that Defendant-Intervenor Nevada Resort's Countermotion for Summary Judgment (Doc. # 30) is hereby DENIED.

IT IS FURTHER ORDERED that the County Population Rule, Nevada Revised Statute § 295.012, is hereby declared unconstitutional under the Fourteenth Amendment of the United States Constitution.

IT IS FURTHER ORDERED that Defendant Miller is hereby enjoined from enforcing Nevada Revised Statute § 295.012.

IT IS FURTHER ORDERED that WTP's Motion to Intervene (Doc. #18) is hereby DENIED as moot.


DATED:  September 29, 2008

_____
PHILIP M. PRO
United States District Judge